UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEON ASKEEA HART, SR., | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §  Case # 1:18-cv-690-DB |
| | § |
| COMMISSIONER OF SOCIAL SECURITY, | §  MEMORANDUM DECISION |
| | §  AND ORDER |
| Defendant. | § |

## INTRODUCTION

Plaintiff Keon Askeea Hart, Sr. ("Plaintiff"), brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Act and his application for supplemental security income ("SSI") under Title XVI of the Social Security Act (the Act). *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and it is before the undersigned, in accordance with a standing order.

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 10, 15. Plaintiff also filed a reply. *See* ECF No. 19. For the reasons set forth below, Plaintiff's motion (ECF No.10) is **DENIED**, and the Commissioner's motion (ECF No. 15) is **GRANTED**.

## BACKGROUND

On July 22, 2014, Plaintiff protectively filed his DIB and SSI applications, alleging a disability beginning on September 13, 2007 (the disability onset date), based on right distal humerus supracondylar fracture; schizophrenia, paranoid type; and polysubstance dependence. Transcript ("Tr.") Tr. 10, 252-55, 256-61, 395. Plaintiff's claim was denied initially on December

18, 2014, after which he requested an administrative hearing. Tr. 109-120. Plaintiff's hearing was held before Administrative Law Judge Stephen Cordiovani (the "ALJ") on September 7, 2017, in Buffalo, New York. Tr. 10-24. Plaintiff appeared and testified at the hearing and was represented by Jonathan Edmin, an attorney. Tr. 10. Timothy P. Janikowski, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id*.

The ALJ issued an unfavorable decision on November 16, 2017, finding that Plaintiff was not disabled. Tr. 10-24. On December 14, 2017, the Appeals Council denied Plaintiff's request for further review. Tr. 1-3. The ALJ's decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II. The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71

(1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national

economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## **ADMINISTRATIVE LAW JUDGE'S FINDINGS**

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his November 16, 2017 decision:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2008;

2. The claimant has not engaged in substantial gainful activity since September 13, 2007, the alleged onset date (20 CFR 404.1571 *et seq*. and 416.971 *et seq*.);

3. The claimant had the following severe impairments as of date last insured: status post gunshot wound to the right elbow with residual neuropathy. Subsequently and as of the date of the Title XVI application, the claimant had the following additional impairments: an adjustment disorder with depression and anxiety; and an unspecified schizophrenia spectrum disorder (20 CFR 404.1520(c) and 416.920(c));

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926);

5. From the alleged onset date until date last insured of March 31, 2008, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)[1] except he was limited to no more than frequently pushing, pulling, and reaching with his right arm. Since April 1, 2008, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he was limited to no more than frequently pushing, pulling, and reaching with his right arm and understanding, remembering, and carrying out simple instructions and tasks. The claimant could not perform supervisory duties or have independent decision-making. He could not perform jobs with strict production quotas or production rate pace. The claimant could work jobs with no more than minimal changes in work routine and processes or occasional interaction with supervisors, co-workers, and the general public;

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965);

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

4

7. The claimant was born on April 22, 1980 and was 27 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963);

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964);

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a));

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 13, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 10-24.

Accordingly, the ALJ determined that, for the application for DIB, protectively filed on July 22, 2014, Plaintiff is not disabled under sections 2l6(i) and 223(d) of the Act. *Id*. at 24. The ALJ also determined that, for the application for SSI protectively filed on July 22, 2014, Plaintiff is not disabled under section 1614(a)(3)(A) of the Act. *Id*.

## ANALYSIS

Plaintiff essentially asserts a single argument: The ALJ did not properly consider the medical opinion evidence, and therefore, erred in assessing Plaintiff's RFC. *See generally* ECF No. 10-1. Specifically, Plaintiff objects to the ALJ's consideration of the opinions of Saburo Okazaki. M.D. ("Dr. Okazaki"), a physician at the University of Buffalo family medicine clinic; psychiatrist Gerald Kleinerman, M.D. ("Dr. Kleinerman"), a state agency medical consultant; and consultative psychiatric examiner Gregory Fabiano, Ph.D. ("Dr. Fabiano"). *See* ECF No. 10-1 at 1, 10, 14-16.

The Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

## I. The ALJ Properly Considered Plaintiff's Alleged Right Upper Extremity Limitations.

First, Plaintiff argues that the ALJ elevated his own lay judgment over the opinion of Dr. Okazaki. Dr. Okazaki opined in April 2015 that Plaintiff should not do any lifting with his right upper extremity. Tr. 678. The ALJ afforded Dr. Okazaki's opinion "light weight" because it provided no subjective complaints or clinical findings to support the statement that Plaintiff could work with limitations of no lifting with his right upper extremity. Tr. 20. As noted by the ALJ, Dr. Okazaki examined Plaintiff only once, at the time of the examination, and his opinion was not consistent with Plaintiff's activity level. *Id*.

The medical evidence with respect to Plaintiff's right elbow documents that Plaintiff sustained a gunshot wound in September 2007, which resulted in an open fracture of the right distal humerus and open fracture of the right ulna coronoid process. Tr. 484. The wound resulted in surgical repair, including, among other things, open reduction internal fixation ("ORIF") with bone graft and stabilization with plate and screw fixation. *Id*. The operative report states that the wound was actually to the posterior aspect of the elbow. Tr. 485. On discharge, Plaintiff had intact sensation to the right hand, medial, radial and ulnar nerves; and palpable radial pulses in bilateral upper extremities. Tr. 488. Motor was intact to the right arm with wrist extension and flexion, intrinsics, extensor, and flexor pollicis of the right thumb. *Id*.

The record reflects that thereafter Plaintiff had a total of nine therapy visits from January 7, 2008, to March 20, 2008. Tr. 533. In January 2008, Plaintiff's range of motion was limited as follows: elbow flexion 82 degrees; extension lacking 40 degrees from neutral; and forearm supination/pronation limited 50%. Tr. 530. His complaint of pain was a "funny feeling" along the healed incision. *Id*. Follow- up CT scans in January 2008 demonstrated internal fixation of the involved bones and no evidence of dislocation. Tr. 531. He was discharged from PT by recommendation of his doctors for lack of progress. Tr. 533. His pain was reported as 2-3 at rest and 4 with exertion, and he was advised to continue a regular assertive program of stretching which he did not do because of the "funny feeling." *Id*. Radiological studies in March 2008 demonstrated satisfactory healing was in progress, but the healing process was "not complete." Tr. 535. Plaintiff was thereafter incarcerated from June 13, 2008, to July 16, 2014. Tr. 591.

In October 2014, Plaintiff saw an occupational therapist following his incarceration. Tr. 676. It was noted that Plaintiff had decreased elbow flexion and extension and forearm supination; however, he had functional range of motion otherwise, and strength for upper extremities and hand function was within functional limits. Tr. 676. In November 2014, he was seen at ECMCC for eye irritation and right elbow pain. Tr. 671. He was encouraged to continue PT, and inspection/palpation for joints, bones and muscles was considered normal. *Id*. Notes reflect that physical therapy was helping him. *Id*. His discharge diagnoses state conjunctivitis of left eye and chronic back pain. Tr. 675. As noted above, in April 2015, Dr. Okazaki limited Plaintiff to no lifting with the right upper extremity due to his right elbow injury and the limitation of range of motion. Tr. 684. In July 2015, he was seen at the Erie County Medical Center ("ECMC") emergency room for human bites, apparently due to an assault. Tr. 665. Although Plaintiff

complained of hand pain (most likely related to the assault), there was no mention of any pain or other issues related to the right elbow. *Id*.

In May 2016, Plaintiff was seen for foot pain which was diagnosed as cellulitis of the left foot. Tr. 657. Records note that Plaintiff "does work as a landscaper and often does a lot of sweaty and difficult labor." Tr. 659. He reported "muscle ache" but reported no complaints specifically with his right elbow. Tr. 660. In June 2016, his range of motion in the right elbow was limited to 90-135 degrees. Tr. 696. In September 2016, Plaintiff was again seen at the ECMC emergency room. Tr. 654. It appears he was in for detox treatment from cocaine. *Id*. He denied any pain and his pain level score was 0. *Id*. In December 2017, Plaintiff's musculoskeletal exam was normal except for limited range of motion of the right elbow. Tr. 762. His last physical examination for hip pain recorded "full range of motion and strength in bilateral upper extremities and lower, specifically, arm flexion and extension" with a noted bony deformity of the right elbow. Tr. 911. He was noted to have a high physical functional status. *Id*.

Plaintiff argues that the ALJ erred in rejecting Dr. Okazaki's opinion because no medical opinion contradicted his limitation. *See* ECF No. 10-1 at 10-13. Plaintiff argues that the ALJ was required to provide an "overwhelmingly compelling justification" for discounting Dr. Okazaki's opinion. *Id*. at 12. The Court observes that although Plaintiff cites a number of cases (nearly two pages worth) explaining that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion" (*see* ECF No. 10-1 at 11-12), that is not the precise issue in this case. The real issue, as Plaintiff ultimately concedes in his brief, is the extent of the evidence on which the ALJ relied to discount the opinion. *See* ECF No. 10-1 at 12. Thus, the issue is whether the ALJ provided an "overwhelmingly compelling justification" for discounting Dr. Okazaki's opinion. *Giddings v. Astrue*, 333 Fed. Appx. 649, 652 (2d. Cir. 2009). The Court finds that the ALJ did so.

In *Giddings*, the Second Circuit remanded a disability case back to the district court, finding in part that the ALJ's rejection of a one-time examiner's opinion was unsupported by the record. Significant in the Second Circuit's analysis was the fact that the one-time examiner's opinion was "the only medical opinion" explicitly addressing the effects of plaintiff's impairments on her ability to work and because the ALJ "did not refer to any medical opinion that contradicted the [consultative] opinion." *Giddings*, 333 Fed. Appx. at 652. The Second Circuit found that "when a medical opinion stands uncontradicted, '[a] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling . . . .'" *Id*. at 652 (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (additional internal quotation marks omitted)).

The present case stands in contrast to *Giddings*. Although no medical opinion specifically contradicted Dr. Okazaki's opined limitations, the ALJ cited numerous examples of objective medical evidence and other evidence in the record in support of his determination to afford the opinion less weight. *See Cruz v. Colvin*, 278 F. Supp. 3d 694, 700-701 (W.D.N.Y. 2017) (ALJ properly afforded limited weight to opinion plaintiff had moderate to marked limitations in mental functioning where objective mental status examinations showed normal thought process and good concentration, normal speech, good concentration, and intact judgment). Accordingly, the ALJ properly concluded that objective medical evidence did not support Dr. Okazaki's right upper extremity limitations, and his determination was supported by substantial evidence in the record.

First, the ALJ observed that Dr. Okazaki did not provide any objective medical evidence to support his right upper extremity limitation. Tr. 20, 678. "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give to that opinion." 20 C.F.R. §§ 404.1527(c)(3). The ALJ also noted that Dr. Okazaki did not cite any clinical findings or provide any evidence of Plaintiff's daily activities

9

to support his limitation. Tr. 20, 678. "Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

Next, the ALJ noted that Dr. Okazaki did not provide any subjective complaints to support his limitation (Tr. 20), which is consistent with the regulations. *See* 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6) (2016) ("we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion"). Additionally, as noted above, it appears that Dr. Okazaki examined Plaintiff only once—at the time he rendered his opinion, as noted by the ALJ (Tr. 20). Furthermore, the record does not appear to contain any treatment notes documenting Dr. Okazaki's exam of Plaintiff that day. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2016) ("the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion"). Finally, although not explicitly considered by the ALJ, the Court notes that Dr. Okazaki is a family medicine practitioner.[2] As such, he would not have had any medical specialty uniquely qualifying him to evaluate Plaintiff's right arm, such as a specialty in orthopedics or neurology. This factor also discounts his opinion. *See* 20 C.F.R. §§ 404.1527(c)(5) (2016), 416.927(c)(5) (2016) ("[w]e generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"). Based on the foregoing, there was substantial evidence supporting the ALJ's assignment of light weight to this opinion.

Moreover, contrary to Plaintiff's argument, the record establishes that he could reach, push, and pull frequently with his right arm. He had full range of motion in his extremities and denied any back, muscle, or joint pain. Tr. 671, 910, 911. He also had intact coordination and normal

---

[2] *See* https://doctor.webmd.com/doctor/saburo-okazaki-250aeb7c-a391-416c-8f99-c70550a1ede3-overview.

10

strength, even when his right elbow had limited range of motion. Tr. 761-62. In addition, Plaintiff admitted to being able to cook, clean, shop, complete his personal care, and do laundry and general cleaning, despite some difficulty reaching due to his elbow. Tr. 580. He also admitted to working as a landscaper even ten years after his elbow injury. Tr. 13, 659. All of this evidence contradicts Plaintiff's claim that he could not do any lifting with his dominant upper extremity right elbow. Tr. 102. Thus, the record supports the ALJ's finding that Plaintiff could reach, push, and pull with his right arm frequently.

To the extent the record shows that Plaintiff was more limited than found by the ALJ, the vocational expert testified at the September 2017 hearing that a claimant of Plaintiff's limitations could work as a laminating machine operator even if limited to using his right arm occasionally, or from "very little up to one third of the time" (Tr. 132). SSR 83-10, 1983 WL 31251, at *5 (occasional means occurring from "very little up to one-third of the time"). Since Plaintiff had normal exam findings, worked as a landscaper, and still had intact strength and coordination, even when his right elbow had limited range of motion, he could use his right upper extremity at least occasionally. As such, he was still not disabled. In any event, the ALJ properly discounted Dr. Okazaki's extreme right-arm limitation and found that Plaintiff could use his right arm frequently. While that limitation "may not perfectly correspond with any of the opinions of medical sources in his decision, [the ALJ] was entitled to weigh all of the medical evidence available to make an RFC finding that was consistent with the record as a whole." *Matta v. v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order). Based on the foregoing, the Court finds no error in the ALJ's assignment of low weight to Dr. Okazaki's right upper extremity limitation.

## II. The ALJ Properly Weighed the Medical Opinions of Drs. Kleinerman and Fabiano.

Plaintiff also alleges error regarding the ALJs consideration of the opinions of Drs. Kleinerman and Fabiano. *See* ECF No. 10-1 at 14-16. The ALJ afforded "great weight" to Dr. Kleinerman's December 2014 opinion that Plaintiff had moderate limitation dealing with others and carrying out detailed instructions, but he could perform simple tasks and follow simple directions in a competitive work environment (Tr. 583), finding that Dr. Kleinerman's opinions were consistent with Plaintiff's treatment record and the opinions of Dr. Fabiano. Tr. 22. Plaintiff takes issue with the weights assigned to these opinions and argues that the ALJ failed to explain why he believed Dr. Fabiano's assessments were generally well supported by the record as a whole. Plaintiff also argues that the ALJ erred in giving great weight to Dr. Kleinerman's opinion because, as a non-examining physician, Dr. Kleinerman "was unable to appreciate the subjective nature of Plaintiff's mental impairments," and because he "was privy to just a fraction of the evidence in the entire record because he reviewed the record in December 2014." ECF No. 10-1 at 14-16.

With the exception of Yogesh Bakhai, M.D. ("Dr. Bakhai"), Drs. Kleinerman and Fabiano were the only medical sources to provide medical opinions regarding Plaintiff's mental functioning, The Court notes, however, that Dr. Bakhai's opinion regarding Plaintiff's need to be court-ordered to continue mental health treatment under New York law following his release from prison was not a medical opinion. Tr. 815-17. As noted by the ALJ , Dr. Bakhai's statement that Plaintiff needed supervised ongoing treatment under State law was not a medical opinion that deserved significant weight by Social Security standards Tr. 22; 20 C.F.R. §§ 404.1527(a)(2) (2016), 416.927(a)(2) (2016) (under Social Security law, medical opinions reflect judgments about what the claimant can still do despite his impairments and his physical or mental restrictions); SSR

06-03p, 2006 WL 2329939, at *7 ("[b]ecause the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies"). The ALJ, therefore, properly discounted Dr. Bakhai's opinion. Tr. 22.

Upon review of the entire record, the Court finds that the ALJ properly afforded Drs. Kleinerman's and Fabiano's opinions great and significant weight, respectively, because they were consistent with the record and each other. Plaintiff had normal mental status exam findings, including cooperative attitude, normal memory, logical thought processes, and intact concentration and attention. Tr. 19, 20, 561, 570-71, 580, 600, 675, 713-14, 761, 766, 865, 902. He also had a good response to his mental health medication; he denied symptoms of depression or anxiety; and he was described as euthymic, or in "a state of mental tranquility and well-being" in June 2016, nearly a decade after his alleged onset date. Tr. 19, 20, 578-79, 624, 628-29, 713, 741-42, 761, 863, 907.

In assessing Dr. Kleinerman's opinion, the ALJ noted that, as a State agency physician, he had specific knowledge of Social Security's disability programs (Tr. 22) because "State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i) (2016), 416.927(e)(2)(i); *Christina v. Colvin*, 594 F. App'x 32, 33 (2d Cir. 2015) (stating that the ALJ must consider findings and other opinions of state agency medical and psychological consultants and finding that the objected-to opinions provided additional support for the ALJ's determination) ( citing 20 C.F.R. § 416.927(e)(2)(i)). Furthermore, the opinions of non-examining sources can override treating sources' opinions provided they are supported by evidence in the record. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993)). Thus, the ALJ afforded

Dr. Kleinerman's opinion great weight. Similarly, the ALJ afforded Dr. Fabiano's opinions significant weight, giving his July 2017 opinion slightly more weight. Tr. 21. The ALJ noted that Dr. Fabiano's opinions were based on thorough exams of Plaintiff and were consistent with the record as a whole. Tr. 21. Furthermore, as noted above, they were consistent with Dr. Kleinerman's opinion, and, like Dr. Kleinerman, were the assessments of a psychologist knowledgeable of the agency's disability programs. Tr. 21.

In addition to his normal mental status exam findings, Michael Godzala, M.D. ("Dr. Godzala"), Plaintiff's treating psychiatrist at Lake Shore Behavioral Health, assigned GAF scores of 55 to 60[3] (Tr. 14-16, 566, 572, 714), signifying only moderate mental health symptoms consistent with the ALJ's findings at step two of the sequential evaluation process. Furthermore, Dr. Moore, a psychiatrist at the Central New York Psychiatric Center, attributed Plaintiff's problems with others during incarceration to his "criminalistic thinking pattern," rather than a mental illness. Tr. 616.

The ALJ also noted that Plaintiff maintained a wide range of daily activities, including cooking, cleaning, shopping, doing laundry, attending his son's football practices with his girlfriend, going to community events to promote a tool library, and taking the bus, if needed. Tr. 20, 77-78, 121-22, 124, 580, 578, 764, 766. Plaintiff also worked during the relevant time period, including cleaning, painting, and landscaping. Tr. 20, 659, 796. Although not full-time work, this work contradicted his claim of disability because any work that a claimant does during a period of alleged disability may show that he can perform substantial gainful activity and is not disabled. 20

---

[3] A GAF score in the 51 to 60 range indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Zabala v. Astrue*, 595 F.3d 402, 406 n.3 (2d Cir. 2010) (internal citations omitted). The Court recognizes that the Social Security Administration has limited the manner in which GAF scores are used because they are generally not useful without additional supporting description and detail. *See Mainella v. Colvin*, No. 13-CV-2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) (internal citations omitted). In this case, Plaintiff's scores were considered in conjunction with other medical evidence, indicating, for the most part, that Plaintiff had only mild to moderate limitations.

C.F.R. §§ 404.1571, 416.971 ("[t]he work . . . that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level . . . [e]ven if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did").

As noted by the ALJ, although Plaintiff struggled with non-compliance and seemed to deteriorate as a result, this occurred while he was incarcerated (twice in 2008, twice in 2010, four times in 2013, and once in December 2015. Tr. 15-16; 19-22, 775-76. Otherwise, when he was out of jail, Plaintiff worked part-time, attended community events, and went to his son's football practices. Tr. 121-22, 124, 659, 796. He also enrolled in college full-time. These actions show that Dr. Kleinerman was correct in assessing that Plaintiff would maintain treatment compliance out of prison. Tr. 581. Thus, the ALJ properly found that Plaintiff could perform as described above, despite his episodes of decompensation, and Plaintiff's argument to the contrary is unavailing.

With respect to Plaintiff's argument that Dr. Kleinerman reviewed the record three years before the end of the relevant time period (*see* ECF No. 10-1. at 15), this does not mean Dr. Kleinerman's opinion was inconsistent with the record. As discussed above, Plaintiff had normal mental status exam findings throughout the relevant time period when not imprisoned. Furthermore, he admitted working as recently as May 2017 and was continuing to maintain an extensive array of daily activities even at the September 2017 hearing. Tr. 20, 77-78, 121-22, 124, 580, 578, 659, 764, 766, 796. Dr. Fabiano also twice observed that Plaintiff was capable of complex work; first before Dr. Kleinerman had even reviewed the record, and then several years later, following an additional in-person exam in July 2017. Tr. 581, 769-71. This evidence, along with other extensive evidence of Plaintiff's ability to perform the range of unskilled work noted

by the ALJ, amounts to substantial evidence supporting the ALJ's findings regarding the opinions of Drs. Kleinerman's and Fabiano. Tr. 21, 22.

Finally, Plaintiff argues that the ALJ erred in evaluating his mental RFC because the ALJ failed to "consider the tremendous degree of social support that Plaintiff was receiving from non-profit organizations, the state, etc." *See* ECF No. 10-1 at 18. Citing *Garrison v. Colvin*, 759 F.3d 995, 1017-18 (9th Cir. 2014), and *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir.2001). The Court has reviewed the above-cited cases and found them unpersuasive, and furthermore, not controlling on this Court. Although both cases discuss the fact that the ALJ must assess a claimant's RFC based on all relevant evidence, they do not instruct that the ALJ is required to give any special consideration to the degree of social service support a Plaintiff was receiving, as Plaintiff suggests. Furthermore, Plaintiff fails to note that much of the "social support" he received was related to post-incarceration support, not mental health treatment.

In this case, the ALJ noted that Plaintiff had a caseworker from Buffalo Federation of Neighborhood Centers,[4] had a bus pass, and was able to get rides from his case manager if he needed them. Tr. 15, 16, 19, 78. Thus, the record reflects that the ALJ considered the fact that Plaintiff was receiving social support but still properly found that Plaintiff could perform the range of unskilled light work assessed by the ALJ based on his normal exam findings, daily activities, continuing work activity, enrollment in school, and other factors. It is well settled that it is the function of the agency, not the court, to weigh evidence. *See Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998). As explained above, the ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole. *Matta*, 508 F.

---

[4] The record indicates that Buffalo Federation of Neighborhood Centers provides Plaintiff with post-incarceration support services. Tr. 78.

App'x at 56. Based on the foregoing, the Court finds that the ALJ's RFC finding is supported by substantial evidence.

## **CONCLUSION**

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 10) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 15) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

_/s/ Don D. Bush_
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE